Next case on our call this morning is 108986, People of the State of Illinois v. Robert B. Becker. Good morning, your honors. Drew Meyer of the Illinois Attorney General's Office representing the people of Illinois. Your honors, the trial court's decisions at issue here, its decision to exclude the testimony of defendants expert Dr. Okla, and its decision to admit the September 19th statements made by the victim, were well reasoned, well founded in the record, far from arbitrary, fanciful, or objectively unreasonable, and therefore did not constitute abuses of discretion. Therefore, we ask this court to reverse the decision of the appellate court. First, regarding the decision to exclude Dr. Okla's testimony, the court found explicitly both that Dr. Okla's testimony was not valuable in light of its simplicity and in light of its ability to be replaced by cross-examination and closing argument, and it found that the testimony severely, or would have severely, infringed on the duty of the jury to determine the credibility of the victim. And again, these decisions, these determinations were well founded in the record. First, this decision is subject to an abusive discretion review, as this court held in People v. Enos. This court also held in that case that the trial court has broad discretion when determining the admissibility of expert testimony, and that its decision on such a matter will not be overturned unless the decision is arbitrary, fanciful, or objectively unreasonable. This court also held in Enos that when determining the admissibility of expert testimony, the trial court should balance its probative value against its prejudicial effect. In this case, the prejudicial effect of the expert's testimony would have been extremely high. It's important to note that before the 115-10 hearing, included Dr. Okla's testimony, and this was her offer of proof. This was the defendant's offer of proof as to what she would testify to at trial. And Dr. Okla was warned, as was defense counsel by the court before the hearing, that, and I'm quoting here, an expert witness has to walk a real tightrope, end quote, to avoid infringing on the province of the jury to judge a witness's credibility while still attacking the techniques used to question that witness. So before the 115-10 hearing, the trial court is already warning both defense counsel and the expert that comment on the propriety of the questioning is one thing, but that the expert cannot cross that line and comment directly on the credibility of the victim. And the expert witness in this case proved repeatedly that she was either unable or unwilling to stay within those boundaries. She commented repeatedly, directly on the credibility of the victim in contravention of the court's warning. First of all, Webster defines credibility as worthiness of belief. The defense counsel and defense expert tried to mask her comment on the victim's credibility with a great deal of semantic camouflage. But what her opinion boiled down to was, you cannot believe what this child is saying. Her testimony is not worthy of belief. And this is a direct comment on the witness's credibility. And, of course, expert comment on witness credibility is prohibited. Just some examples of Oklah's direct testimony showing that the trial court's decision here was well founded. And this is, again, after the warnings. Dr. Oklah testified that there is no point in interviewing a child at this point. They've been interviewed a gazillion times. There's no clean evidence left to get. Defense proposes that the trial court did not consider this issue carefully. But, indeed, after defense counsel and prosecution cross-examined and direct-examined Dr. Oklah, the court examined Dr. Oklah itself. And one of the questions the court asked, because it was trying to get at whether Dr. Oklah's testimony was going to infringe upon the province of the jury to determine credibility, was, and this is a quote from the court, I suppose that if you're testifying at trial and this young girl gets up and testifies, that you believe, based on everything that has transpired with her in terms of questioning, that she can't even give us a reliable statement in person on the stand. Dr. Oklah's answer was, not now. That's correct. That's my belief. Dr. Oklah also dismissed the value of cross-examination of the victim by saying that another expert's opinion that if a child is suggestible, she can also be counter-suggestible, and therefore cross-examination can heal some of the wounds that were allegedly inflicted during prior questioning, and she said that no, cross-examination is useless for that purpose. And the court explicitly held. Counselor, the 115-10 hearing refers to providing sufficient safeguards of reliability. Yes, Your Honor. And you were using reliability in the definition, I think, of that and credibility. Is there a difference between reliability and credibility, and if so, what is it and why does it make a difference? Absolutely. And the question, the court answers the question side-by-side because it determines at once that Dr. Oklah's testimony is appropriate at the 115-10 hearing for purposes of determining the statement's reliability is under that section. But the court makes a twin finding or holding that the testimony is inappropriate because it infringes on a credibility determination. So, again, and the two concepts are very close, but the definition of credibility is worthiness of belief. And Dr. Oklah's testimony directly attempted to undermine the worthiness of belief in the victim's testimony. So Dr. Oklah was not being offered to discuss the types of things that could affect the credibility of the child witness. You're saying she was being offered to comment directly on the credibility. Both, Your Honor, and she was commenting both on the questioning techniques that were used and the improprieties therein, but she was also repeatedly, after having been warned not to, also repeatedly commented directly on the victim's credibility and saying that the victim could not be issue under 115-10 and the statements that she would make at trial as a witness could not be believed and that cross-examination could not solve the problem. Is the trial court's determination that the hearsay statements come in because it's reliable, does that foreclose that issue then? It's reliable, but there still is an issue of credibility for the jury to determine? Oh, absolutely, Your Honor, yes. But it's determined that whatever criteria the expert used to say that it wouldn't be credible, has the trial court refuted that or found that that's in this circumstance that the trial witness' testimony or hearsay statements were reliable? Well, they're two very different standards. Under 115-10, it is for the court to decide in a hearing before the trial whether or not the statements are reliable enough, given the circumstances surrounding them, to place before the jury. But once the jury is the trier of fact, the law protects the sanctity of its determination regarding the credibility of witnesses. And the court was very cognizant of the sanctity of that function, and its decision was based on an effort to protect the sanctity of the jury's function. So it makes a determination, the court makes a determination before the trial, regarding the reliability of the statements. But the jury makes its own determination regarding the credibility of the witnesses and how much stock to place in the 115-10 statement. So again, these decisions were made side by side to allow Dr. Oakley to testify regarding the reliability of the statements under 115-10 and the decision that, and a thoughtful, well-reasoned decision on the court's part, that while acceptable for that purpose, unacceptable and inappropriate for the purpose of commenting on the witness' credibility, and that's why its decision was far from an abuse of discretion. Counsel, didn't you say that it's well-known to parents what children could know or how interviews could be? And I think that you had said that this particular expert witness, though, would provide the jury with interview techniques which are proper and which are not proper, and that is not something that the average juror would know, would they? Well, the concepts that were actually applied in this case were extremely simple, common-sense subjects that were gussied up with a lot of technical jargon. For instance, leading questions suggest answers and should not be asked. Well, that seems a simple technique. Oh, absolutely. I completely agree. It's a very simple technique. So I discussed the prejudicial effect of the doctor's statements, but that goes to the lack of probative value that the doctor's testimony had, because the phenomena that she was discussing were very easily understood, common-sense, and easily exploitable in plain language by defense counsel in closing argument. So I agree with your argument. But closing argument is not evidence. It's not evidence, and as we point out in our reply brief, the jury's freedom to disregard certain informational input, let's say, is not a basis upon which to distinguish between Dr. Oakley's testimony and closing argument. The jury is free to disregard the opinion of the expert as well. So, you know, and here's an important point. The reason the jury is protected from expert testimony on topics that it could well decide for itself is that the expert is cloaked with the appearance of her ability to offer opinions beyond the ken of the normal juror. And the law does not want the jury to abandon its duty to determine credibility, to think for itself on issues that are well within its ability to understand. So, again, the simplicity of the concepts Dr. Oakley discussed goes to its lack of prejudicial, or lack of probative value, excuse me. The court explicitly held, going back for a moment to prejudicial effect, that the testimony Dr. Oakley would have provided significantly infringes upon the jury's duty to assess for itself the weight and the credibility of the victim's statements. And in offering an expert's opinion on the victim's credibility to testify accurately, defendant is directly attacking the victim's credibility. There is no other possible inference. Now, both the appellate court and defense argue that if an expert says, promises, that it is not testifying regarding the credibility of the witness, that this removes any concerns regarding inappropriate influence on the jury. But, as we see in this case, defense counsel repeatedly assured the court that Dr. Oakley would not testify regarding credibility, and yet she did so repeatedly in terms certain and uncertain. Indeed, at the end of her testimony, Oakley stated, Now it's too late for us to go back and say which of these things are true or false, because she's heard it so many times. It does educate you, hopefully, about all the reasons why you should or should not put weight on her credibility one way or another. So in light of Oakley's own words in their offer of proof at the 115-10 hearing, the court's finding that this testimony would have had substantial prejudicial effect and its invasion of the province of the jury to determine credibility was well-founded. As Justice and I were just discussing, the probative value of this testimony was also low because the concepts at issue were simple, easily understood, and easily explained on closing argument. And the trial court recognized the simplicity of these concepts. A layperson doesn't need an expert to understand that an interview method can affect the information gathered. Jurors can assess flaws that Dr. Oakley discussed using common sense gleaned from, quote, everyday life. And then quoting the Wilson court, the trial court stated, The limited cognitive abilities of children are well-known, and any jury can be expected to take that factor into account when determining a child's credibility. The court also explicitly held that cross-examination and closing argument would suffice to bring before the jury the points that defense was trying to establish through Dr. Oakley. To quote the court, Virtually all the points defendant seeks to establish can be accomplished through cross-examination or summation. And indeed, cross-examination of Detective Edelman during the 115-10 hearing elicited several admissions that his technique was flawed in various ways that Oakley discussed. And closing argument by defense counsel exploited many of these admitted flaws, explaining the flaws that Dr. Oakley was intended to discuss in plain language. Briefly, moving on to the September 19th statements. The court has no other questions regarding the admissibility of the expert's testimony. Again, this is an abusive discretion review, and the court's decision to admit these September 19th statements was reasonable. First of all, there are several factors that a court can consider when determining the admissibility of a statement under 115-10. Spontaneity is one of them, and the record establishes that these statements, which were, I miss my daddy, but he hurt my front bottom, and also I'm afraid daddy will come and hurt my front bottom when she's being put to bed that night, were entirely unprompted by questioning, entirely unprompted by the topic of conversation that she interrupted. So these, spontaneity was clearly weighed, is a factor that weighed in favor of their admission. Consistent repetition. These statements were, as the appellate court held, identical to the statements, the first statement she made about this issue in the bathtub on April 21st, 2003, daddy hurt my front bottom. Substantively identical. The appellate court and defense argue that the addition of her expression of fear of her father, I'm afraid daddy will come and hurt my front bottom, somehow indicates that she was subject to suggestive questioning. But we submit that that is not a reasonable basis upon which to infer that suggestive questioning took place. Of course a child is going to be afraid of an adult who has hurt her by sexually abusing her. So that is not, there is no evidence when you compare the initial statement on April 21 to the statements at issue here that suggestive questioning had any effect because these statements are identical. So yet another factor in favor of admission of these statements. Again, language expected of a child of similar age is another factor that the court can consider. And daddy hurt my front bottom, I think we can all agree that that is a statement that a child of three or four, which the victim in this case was at the time, would use. I see that my time is up and I will save my reigning points for rebuttal. Thank you. May it please the court, counsel. I'm Sarah Schrupp from Northwestern University's Bloom Legal Clinic and along with my colleague, Jeffrey Dangin, we represent the appellee, Robert Becker. There is so much wrong with this case for this former family, for the truth-seeking function of our system of justice, and for my client, Rob Becker, who is denied his right to a fair trial. So the appellate court correctly found that the trial court erred in depriving Mr. Becker of his expert at trial and in admitting unreliable and prejudicially cumulative hearsay testimony. Turning first to the exclusion of defects expert, Dr. Catherine Okla, this court should affirm the appellate court for three reasons. First, the trial court used the wrong legal tests. So it was not just this simple routine exercise of discretion as the state paints it, but rather errors that this court should review de novo or that at a minimum constitute a per se abuse of discretion. Second, as a matter of policy and application, upholding the trial court's approach here would not only contravene the weight of authority, but it would create a categorical ban on certain types of expert testimony in a wide range of cases, and it would exclude an entire array of evidence in cases that boiled down basically to two competing stories of what occurred. Finally, the trial court's factual errors here were arbitrary and unreasonable in an abuse of discretion. The trial court erred in concluding that every bit of Dr. Okla's testimony was outside the common knowledge of jurors. It erred in concluding that Dr. Okla would inevitably comment on Olivia's credibility. And it erred in concluding that cross-examination of the state's lay witness and closing argument were adequate equivalent evidentiary substitutes for Dr. Okla. Now, before I touch on these in just a little more detail, I want to clear up just a couple points from the state's briefing argument. First, the state's brief intimates that abuse was a foregone conclusion in this case. In fact, the physical evidence and medical proof in this case were exculpatory. Three of the four medical professionals who examined the child found inconclusive evidence of abuse, including Dr. Powell, who examined the child within two days of the alleged incident. That the state secured a conviction in light of this exculpatory evidence illuminates how harmful the exclusion of the defense expert was. Second, it's very important to clear up the state's repeated and continual insistence here that Dr. Okla directly and repeatedly opined and that she somehow couldn't help herself from doing so in the 11510. None of the examples that the state quotes as Okla's direct comments on her credibility came from her direct testimony during the 11510, but rather from questions that the state elicited on cross-examination and that the trial court asked itself of her afterwards. So the state and the trial court asked these questions, required her to answer them, she was under oath, and then turned around and claimed that she must be excluded from testifying on trial based on this information that they specifically asked her to give. If you look at defense counsel's direct examination, its offer of proof during the 11510, you'll notice that it was very narrowly circumscribed to the interviews in concert with the science and offering an opinion that never once says that you should believe or not believe this child. Mr. Shrew, on the 11510 issue, Justice Holdridge dissented in this case. I'm going to do my best to paraphrase that dissent and ask you what's wrong with it. He indicated that and argued that Dr. Okla testifying would have contravened 11510 because his argument is that 11510, that there has to be a determination of reliability before trial. So I believe he went on to say that if indeed the child was found reliable, if indeed Dr. Okla was allowed to testify again at trial, that would have the effect of reopening the reliability question, which, at least in his opinion, in the legislature specifically designed to be settled outside the jury's presence at the 11510 hearing. What's wrong with his argument? Well, what's wrong with his argument is that the concept of reliability in 11510 is a completely different concept from what happens at trial. The jurors actually do assess the evidence for reliability and credibility, and I'll get to that in a second. But by drawing this artificial distinction between reliability determinations as the sole province of the judge and credibility determinations as the sole province of the jury ignores the fact that 11510 reliability determinations serve a very limited purpose, to establish a threshold admissibility for hearsay statements. But that says nothing to the fact that the jurors then at trial also in their task of weighing all of the evidence and examining all the evidence, they too engage in reliability determinations, reliability meaning the accuracy, the underlying methodology, that underlies evidence, those kinds of things, and those are the precise kinds of things that Dr. Oakley was going to testify about. So the jury looks at that, those kinds of things, and then also does weigh credibility. That is believability. So the dissent and the state and the trial court erred in drawing this artificial distinction that shoves all reliability for all purposes on one side and credibility on the other side. Would it be proper for the expert to offer an opinion as to the credibility of the witness at trial? I think that this court's precedent would support it. Merchants and Terrell would support it, as does, I think, the impending codification of the rules of evidence in this state. This court doesn't need to reach that question because there are ample bases short of that. But yes, the thrust of Illinois evidentiary law is if it satisfies the baseline test, which is expert qualifications and assisting the jury, then it goes in and lets the jury weigh the evidence. You know, jurors, this comment that the state has about this expert sheen and being prejudicial, first of all, that's not what prejudice means in the 403 balancing. So it's prejudice to a party. And the fact that they have a concern or the trial court had a concern that the jurors would unduly credit an expert belies what jurors do every day. Jurors often have to choose between two experts in a case, and if they were overwhelmed by an expert sheen, they would not be able to choose between expert testimony. So it's against this backdrop of what Dr. Oakley's actual offer of proof was and how narrowly circumscribed it was that I turn to the remaining significant legal errors in this case. As I just mentioned, Illinois' test for expert admissibility is a pro-admissibility standard, and it's embodied in Enos, in Jordan, in Miller v. Wilson. The trial court explicitly acknowledged it. It called her testimony valuable. But then the trial court went on to simply not apply this test and to therefore deprive the jury of important tools that they needed to decide this case. Its second related error was to view this case not through Enos and Jordan and Miller, but through the fourth district case in Wilson, which articulates a different test, a wrong test, from this court standard, and also erred in looking at this through the 11510 hearsay statute, which is irrelevant as to whether Dr. Oakley is admissible at trial, which also gets to sort of the dissent point here. It's a retreat both from this court's long-standing pro-admissibility standard and the impending codification. These rules, the proposed rule 704, for example, deals specifically with experts able to offer ultimate opinions in a case. And what's interesting is the analog, the federal analog to proposed rule 704 explicitly discusses this, and it's not the notion of invading the province of the jury to decide credibility. Explicitly considers that and explicitly rejects it as, quote, empty rhetoric. And our state's law is consistent with that position. In any event, Wilson is internally inconsistent, and so it's also legally wrong for that. It says on the one hand that expert testimony that is too generalized isn't probative because, and I quote from Wilson here, it would have nothing to do with the credibility of the children. But then in the same breath, just a little later down in the paragraph, Wilson turns around and says that comments on credibility improperly impinge on the province of the jury. So it's unclear how you use credibility under Wilson's own terms. It's also a case that creates confusion and is difficult to apply because courts interchangeably and inconsistently define the terms credibility and reliability. And it's especially problematic when, as here, it leads trial courts to apply the 11510 hearsay statute to the question of expert admissibility. In this case, the trial court linked its decision about Dr. Okla no less than four times in its oral and written rulings to the statute, to 11510. It says explicitly in its written order, the starting point for this analysis is 11510. So, like the dissent, the trial court drew this artificial distinction between balancing reliability determinations and balancing credibility determinations. And as I mentioned, jurors actually make their own reliability determinations, and Okla would have helped with that. So it was not only this artificial demarcation and this reliance on 11510 was not only legal error, but it was arbitrary and unreasonable and an abuse of discretion. In any event, even if this court were to find that Wilson applies in some cases, it doesn't apply in this case because it's factually distinguishable. Wilson, by its very terms, only applied to very generalized testimony. The expert was only going to talk about general things that were not tailored to the exact children in this case. Dr. Okla, of course, looked at the specific interviews, the interrogatory episodes, and the signs underlying them and applied them in this case. Second, turning to the broader implications of this case, which is important, it was error for the trial court to completely exclude Dr. Okla because this was tantamount to a categorical ban on any expert testimony, not only in this case and but in cases where an expert's testimony is used to shed light on witness perception, on a witness's behavioral or emotional or mental or physical limitations that impact how that individual perceives or remembers or responds to events. This trip, was Dr. Okla a court-appointed expert? No. In this case, no, she was not. She was a defense expert. In addition, under the trial court's approach, no evidence could ever come in within a case where two people claim two totally different stories or competing stories of the same events. In such cases, every single piece of evidence goes to undercut and comment on the credibility of one side or the other. Under the trial court's approach, had it been applied consistently in this case, none of the medical evidence, the exculpatory medical evidence, could have come in because nor could have Mr. Becker's own testimony where he vehemently denied touching his daughter. That couldn't have come in either because in the trial court's own words, quote, boiled down to its core, the credibility is being challenged. Finally, alongside these many legal errors, the trial court committed a number of fact-based errors that also warranted reversal. First, it erred in concluding that not one bit of Dr. Okla's testimony was outside the juror's common knowledge. The best concrete example from this case is the protocols, which you mentioned before. Even Detective Edelman, a juvenile detective who by his count had conducted hundreds, if not close to 1,000 child interviews, even he acknowledged that he didn't know the governing protocols. He knew some of their principles. He knew no details about them. It was outside of his common knowledge as a juvenile detective. If it's outside of his common knowledge, it's certainly outside the common knowledge of an average juror. The trial court further erred in concluding that none of Dr. Okla's testimony would assist the jury in a common role that experts play at trial, which is clearing up common sense misconceptions the jurors might harbor. A good example from this case is the impact of repeated questioning. For an adult, the belief is the truth is the truth is the truth, no matter how many times you're asked the question. It might have surprised those jurors to learn that based on the science, children react differently. When you repeatedly ask a child the same question, those children tend to believe that their first answer was wrong and change subsequent answers. And not only would she have described this scientific principle, she would have actually applied it in this case to specific examples, such as R831, where she pointed out that Detective Edelman first asked Olivia, did you tell anybody? And she said no. And then he responded, no. Did you tell your mommy, repeating the question? And she said yes. Third, the trial court failed to recognize that Okla had value not only in identifying these misconceptions, these steps in questioning and these suggestive principles, but also in quantifying their impact and explaining their damage in a way that no one else could do at trial, certainly not Edelman. So although jurors, for example, might suspect that false allegations might be higher in a contentious divorce, only Dr. Okla could have told them to quantify it, that it's actually six times higher. And this is a divorce case, a contentious divorce case. Similarly, the jurors might have a general idea, and the state continues, oh, it's all common sense, and it's just stuff everybody understands. But that's not the case. I mean, they might have a general sense that if you ask a leading question, you're going to change an answer. But what they might not know about are the concepts of psychological rehearsal or this mousetrap study that I believe we talked about in our brief, where children were interviewed suggestively a number of times and told they got their fingers caught in a trap, and it was all just a fiction. So Okla could have discussed these things, and then again, she could have linked it to precise examples in this case. For example, she did link the mousetrap study to when Amy Becker laid down on the floor in the initial reporting, thus suggesting a specific factual scenario to the child that the child could have then internalized. The trial court further erred in concluding that Mr. Becker should have to present his defense through cross-examination of the state's witnesses. It erred in assuming that Edelman was a precise evidentiary substitute for Okla's scientific in-depth and expert testimony, which is what the cases require. The Supreme Court decision in Old Chief requires, and I quote, the same or greater probative value for any substitute evidence. But Edelman could provide neither the breadth nor the depth of Dr. Okla's testimony. Not the breadth, because he admitted he didn't know any of the details, not only about the protocols, but about the science underlying any of the suggestive techniques that he even acknowledged. Nor did he have the depth of knowledge of Dr. Okla, because he could not quantify the impact of these questions. Similarly, he also lacked breadth because he couldn't comment on any of the other interrogatory episodes to which she was subjected. He admitted that he didn't know any of the details about the other interviews. So only Dr. Okla was the only person who could have testified at this trial. How the other interviews and therapy sessions and so on might have impacted Olivia's reporting. Now the state actually admits in its brief that Edelman was not an equivalent substitute, but then goes on to claim that Edelman, plus the defense lawyer's closing arguments, something that the jury was repeatedly warned was not evidence and could be disregarded, equal Dr. Okla's expert testimony. But Old Chief requires evidence, and this court has made clear in West that closing arguments are not evidence. Nor can you equate Dr. Okla, which the jury can disregard, with disregarding closing arguments. Dr. Okla was evidence. So if they disregarded, they're free to reject it, but if they did so unreasonably, they would be subject to a manifest weight of the evidence challenge. That's not, no such difference holds true for closing arguments. Finally, it was aired in showing that, that finally aired in concluding the that she was going to offer a bare comment on credibility. As we said, she wasn't going to do that. And that nothing short of a total exclusion would remedy the trial court's concerns, even if those concerns were valid. Now these were harmful prejudicial errors, especially in light of a defendant's constitutional right to present its defense. In light of the admission of Fujara's inadmissibly generalized, impermissibly generalized and inapplicable testimony about children who have sexually transmitted diseases but deny abuse, the fact that the state explicitly used Fujara's testimony to bolster Olivia's credibility during its closing rebuttal, something that the defense could never respond to, and especially in light of the exculpatory medical evidence in this case. Now turning briefly to the September 19th statements, the appellate court correctly found that the state had failed to meet its burden by failing to show that the additional police interviews and therapy to present any evidence did not impact Olivia's reporting, that her reports were not the result of adult prompting and manipulation. These are precisely the kinds of interrogatory episodes that spawn so much false reporting. So this gaping omission of these important interviews created the very same kind of silent record that troubled this court in Swarth. This gaping hole combined with the fact that the trial court made no findings and combined with the fact that there were several factors that indicated unreliability, namely that the child's story had morphed over the five months between the initial reporting and the September 19th. She claimed her mother did it. She claimed her friend Grant did it. She denied abuse. She said her dad did it. The fact that she added the element of fear. The fact that there were five months. The appellate court correctly determined that it could not affirm on this silent record. In any event, the state waived harmlessness and any argument that this evidence was cumulative. They declined to address in any way before its brief to this court these topics. Not in its PLA and not in the appellate court, even though we explicitly flagged these issues for them. So this case is on all fours with this case, this court's decision in Carter where this court held that the state had waived its arguments by failing to address them. For these reasons and those in our brief and if the court has no further questions, I respectfully request that this court affirm the Illinois appellate court. Thank you. First of all, let me deal with a couple of mischaracterizations. The trial court's holding here by no means embodies a testimony of a witness. It does not remotely touch on the credibility of a witness. What the trial court said before the 115-10 hearing is that the expert could testify regarding the questioning techniques, but that expert had to stop short of commenting directly on the credibility of the witness. Now, this is something, again, that Dr. Oakland proved repeatedly unable to do. Defense counsel stated that, well, Oakland did comment directly on the credibility of the witness, but only in response to cross-examination and the court's own examination. First of all, it doesn't matter to the jury who is hearing this evidence how it is elicited. Second of all, in the defendant's own brief, the defense counsel did not comment directly on the credibility of the witness. On the topic of Dr. Oakland's admissibility, it stated that she would comment that the questioning had affected her ability to testify accurately regarding the events, which is, again, semantically different, but substantively identical comment that she could not be believed, that you could not believe the words that she would speak on the stand or the statements that she made and that were admissible under 115-10. So this is not a categorical ban. This is the court conducting a balancing test, the appropriate test. The court did not apply 115-10 in conducting this balancing test and in determining that Oakland's testimony was not admissible. It applied the balancing test prescribed by this court in Enos and mentioned in Wilson, and it is otherwise unacceptable for the court to apply a balancing test. It is up to the judge's discretion. And in this case, the court's determination was reasonable, far from arbitrary or fanciful, because Dr. Oakland, again, repeatedly commented directly on the credibility of the witness. And I should say, the defense counsel answered the question, is it appropriate for an expert to comment directly on the credibility of the witness in the affirmative? That is clearly contrary to Illinois law. And it is also not appropriate for an expert to comment directly on the credibility of the witness. It is also contrary to the notion that the jury should be left to make its own decisions when its own abilities to understand the subject matter at issue allow it to do so. It is riding roughshod over the jury's function, a function that the law protects. So, no, it is inappropriate for an expert to comment directly on the credibility of the witness, because the expert in this case repeatedly did so. In fact, it was at the heart of her testimony that the statements that Olivia would make on the stand or before trial were not accurate, that she could not be accurate, which is the same thing as saying that she is not to be believed, that her account of the assault is not to be believed. So, again, it is a balancing test. And the court applied it correctly. Again, part of this balancing test is determining the probative value of the testimony. And the state has never said that every bit of Dr. Opa's testimony was replaceable by cross-examination closing argument, but it was largely replaceable by cross-examination closing argument, which discounted its probative value. So, the fact that it was, I think the term was precise evidentiary substitute, the fact that there was no precise evidentiary substitute is not determinative. The court determined that it was largely an evidentiary substitute. The cross-examination closing argument would have been vindicated because many of the flaws that Okla would have testified to were elicited on cross-examination of detective Edelman and exploited by defense counsel in closing argument in plain language that your average juror could easily understand. We are not arguing, and we have never argued, that the reliability determination is entirely in the province of the jury. And it confuses the issue. The issue here is whether it was reasonable for the court to fear the invasion of the province of the jury to determine credibility to the extent that that danger was more prevalent than the probative value of the testimony. And, again, the record clearly supports that conclusion. Regarding the statements on September 19th that were admitted under 115-10, the statement didn't morph in the words of defense counsel. The statement was, as the appellate court held, identical to the statement made on April 21, the initial disclosure of abuse. So, there is absolute consistency regarding the statements at issue here, September 19th, and the statement that was made on April 21, the statements, and the initial statement that occurred before any of the questioning that defense counsel highlights. Regarding Zwart, Zwart is distinguishable on several grounds. First of all, the victim in Zwart did not identify the defendant there as her assailant until she had been interviewed by three separate people. In this case, before any interview, she had been interviewed by three different people. In this case, the victim identified the defendant. In addition, this court in Zwart said that it was particularly important to know the content of the interviews that had intervened between the incident and the statement at issue, because the victim was not available at trial. In this case, the victim testified, was subject to cross-examination. And, most importantly, perhaps, the content of the examinations and the interviews of the victim in this case was not available at trial. So, the content of the interviews in this case were largely introduced into evidence, and the court was able to consider them. So, Zwart is far from on all fours with this case. Indeed, this court in People v. West held Zwart in apposite, where the child implicated the defendant immediately, which is what we have in this case, and where most of the adults who talked with the victim testified and were subject to cross-examination. Again, the same situation in this case. So, as West shows, Zwart is not on all fours with this case. Regarding the harmlessness of the admission of the September 19, 2003 statements, first of all, these statements were not cumulative. This was, the comment that they were cumulative was part of the appellate court's discussion of their admissibility under Section 115-10. As we point out in our brief, cumulativeness is not a ground upon which to exclude something under 115-10. 115-10 requires the court to determine its reliability. That is the only criteria. Based on the circumstances. And these statements were not cumulative. Defendant had attacked Amy Becker's credibility, and she was the one who testified to the initial outcry and to several subsequent outcries that were admitted under 115-10. And we have Dr. Reyes here, who was a Ph.D., had no stake in the matter, although she was Amy's friend, testifying that she, too, heard these outcries. I miss my daddy, but you know he hurt my front bottom. And mommy, don't go. I'm afraid daddy will come and hurt my front bottom. These were very important for corroborating Amy's testimony and for bolstering her credibility after it had been attacked. So in no way were the September 19th statements especially as shared by, as testified to by Dr. Reyes, cumulative. We merely pointed out that if they were cumulative, then they would be by definition harmless. But again, cumulativeness was not a ground upon which to exclude the September 19th statements. And I see that my time is up. So we ask that this Court reverse the decision of the appellate court, because the trial court's decisions in this case were reasonable, not uses of discretion. Thank you.